```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF INDIANA
                        HAMMOND DIVISION

COLEEN JENNINGS,                   )
                                   )
     Plaintiff,                    )
                                   )
vs.                                )   NO. 4:04-CV-94
                                   )
WARREN COUNTY COMMISSIONERS,       )
WARREN COUNTY SHERIFF'S            )
DEPARTMENT, and WILLIAM H.         )
MILLER, Individually and in        )
his capacity as Sheriff of         )
Warren County,                     )
                                   )
     Defendants.                   )
```

## OPINION AND ORDER

This matter is before the Court on: (1) Plaintiff's Motion for Summary Judgment, filed on September 29, 2005; and (2) Defendants' Motion for Summary Judgment, filed by all Defendants on November 30, 2005. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk is **ORDERED to DISMISS** this case **with prejudice**.

BACKGROUND

Plaintiff, Coleen Jennings, became employed by the Warren County Sheriff's Department in January 1983. (Pl.'s Dep., p. 11.) For the first 12 years of her employment, Plaintiff served as a secretary to the Warren County Sheriff. (Pl.'s Dep., p. 12.) Then, she served as a matron – head of the kitchen at the Warren County Jail – for six and

one-half years.  (Pl.'s Dep., p. 12, 13.)  On May 23, 2001, Warren County Sheriff William H. Miller, demoted Plaintiff to deputy matron. (Pl.'s Dep., p. 25, 26; Miller Aff. ¶ 10.)  According to Plaintiff, Sheriff Miller told her the reason for the demotion was that certain jailers were upset with her.  (Pl.'s Dep., p. 26.)  Aside from her secretarial and kitchen duties, Plaintiff filled in as a jailer and helped out in the control room.  (Pl.'s Dep., pp. 12-13; 118.)

After an incident at the jail on October 21, 2004, involving a verbal confrontation between Plaintiff and the jail commander over the kitchen menu, Plaintiff was issued a written warning on November 3, 2004. (Miller Aff. ¶ 10; Compl. Ex. B.)

In October 2004, Plaintiff contacted the labor board in Lafayette, Indiana, to discuss a number of employment related issues. (Pl.'s Ex. E; Pl.'s Dep., pp. 42-49.)  While talking to the labor board, Plaintiff was told that her biggest concern should be safety issues in the workplace.  (Pl.'s Dep., p. 49.)  Based upon this conversation, Plaintiff drafted a letter with the help of her daughter and then took the letter to her attorney, who read the letter and had her secretary type it out.  (Pl.'s Dep., pp. 38-41.) On October 29, 2004, Plaintiff sent this letter to the Warren County Commissioners. (Compl. Ex. A.)  Plaintiff also forwarded copies of the letter to the Indiana Department of Occupational Health, Council members, Sheriff Miller, "Merit Board," County Attorney John Rader, and Evelyn Turner at the Indiana Department of Corrections.  (Compl. Ex. A.)  The letter

reads:

> Dear Commissioners,
>      I feel it is my responsibility as a county employee and a citizen of Warren County to bring to your attention serious security lapses at the County jail. I have brought these issues to the attention of Sheriff Miller beginning in December, 2003, but unfortunately, violations of standard operating procedures are still occurring. I believe these security breaches represent a serious and imminent threat to jail employees, prisoners and the public at large. In today's climate of heightened violence and acts of terrorism, these security issues must be addressed before a tragedy occurs.
>      As mentioned I sent Sheriff Miller a letter on December 15, 2003 detailing incidences of prisoners being out of control and doors not beings [sic] secured and or locked. Shortly after my letter, Sheriff Miller reminded jail staff to keep doors locked and secured, but he has not enforced the rules at any time. As recently as this July, I have reminded Sheriff Miller again of my concerns.
>      Listed below are two of the more serious incidences that have occurred:
>      In July, I was serving lunch and an inmate, Delaney, was asking Norma if she had gotten in touch with his parole officer. Norma stated that she had done all she could do. Delaney said that he would get out of there "today one way or other." Norma then informed Delaney to do whatever he had to do. I went back to the kitchen and cleaned up the kitchen area. I went back to see if Delaney was in segregation because he was getting very upset with Norma because he wanted to leave the jail. Delaney was still in his cell and the trays weren't out yet so I went back to the kitchen. I was in the kitchen approximately five minutes when I heard a terrible noise. I went to the kitchen door and looked out the window and saw trays and food all over. The tray cart was turned on its side between A and B cells. I proceeded out the kitchen door and into the control room to see if they needed help. I heard jailers telling inmates to lock down. As I entered the control room Pam

-3-

Miller told Rhonda to get padded cell ready and the prisoners needed to lock down. C cell did not lock down. Pam and Liz Hunter were calling for Rusty and Vince. I told C cell three times before they would lock down and C cell kept buzzing. I told them to be quiet until we got things under control. Vince and Rusty went to the cell block to get Delaney. Pam was in and out with Liz getting things ready to move Delaney. D cell wouldn't lock down but as soon as I told them, they locked down. The safety issue to this is I was able to go out the kitchen door, which was unlocked, and into the control room, which was unlocked as the inmate came out of the cell to bring out trays.

 In September, prisoner Hanner, a Trustee, found guns in Donny Miller's (deputy) vehicle. Donny was written up for this incident. Approximately one week later, Hanner stated that he found the guns while washing Donny's vehicle and reported to the jailer that he found a gun. The jailer secured the weapon and Hanner then proceeded to wash the vehicle where he again found another gun and again reported this to the jailer who secured the second weapon. Hanner stated that he thought he should be released early because he showed good faith in reporting the guns. He said he could have gotten out because the garage doors were open about three feet and he could have taken the guns and killed a bunch of people in town or he could have taken them back to his cell and killed jail employees because jailers don't search him when he goes back in his cell.

 These are two serious incidences but violations occur daily.

 The Department of Corrections' mission statement states that DOC "is to protect the public by operating facilities and programs in a safe, secure, effective manner." The Warren County Sheriff's Department currently houses DOC prisoners and is falling far short of this mission statement.

 It saddens me to bring this to your attention, but our first responsibility must be to keep the public, staff and prisoners safe. In addition, I fear for my own safety as a County worker at the jail.

-4-

>Sincerely,
>
>/s/ Coleen Jennings

On or about October 29, 2004, Sheriff Miller became aware of Plaintiff's letter. (Miller Aff. ¶ 4.) He knew of and investigated the two specific instances described in Plaintiff's letter. (Miller Aff. ¶ 5.) While he acknowledged that the two alleged incidents did occur, Sheriff Miller believed that "highlighting these incidents mischaracterized the department's operation, particularly when the letter did not also disclose that the incidents were investigated and corrective action taken." (Miller Aff. ¶ 7.) In addition, he believed "the vague and inaccurate statement that other violations and incidents occur daily was misleading, false, and tended to disrupt the close-knit operation of the other employees in the Warren County Sheriff's Department." (Miller Aff. ¶ 7.)

The operation of the Warren County Sheriff's Department requires the cooperation of officers and support staff. (Miller Aff. ¶ 6.) Sheriff Miller viewed Plaintiff's allegations as sensationalized and a mischaracterization. (Miller Aff. ¶ 7) As such, the letter reflected negatively on the department, its personnel, and its operation. (Miller Aff. ¶ 7.) Sheriff Miller concluded that Plaintiff's statements negatively impacted the department's morale and created concerns about her effectiveness working among a small group of fellow employees. (Miller Aff. ¶ 8.) In addition, Sheriff Miller found Plaintiff's letter violated the internal policies of the Warren

County Sheriff's Department.  (Miller Aff. ¶ 9; Pl.'s Compl. Ex. C.) Ultimately, Sheriff Miller believed Plaintiff's letter "constitute[d] a challenge to the Sheriff's authority and was calculated to embarrass the Sheriff and his department by mailing the letter to other governmental entities without any authority whatever over the operation of the Sheriff's Department or the county jail."  (Miller Aff. ¶ 11.)

On November 17, 2004, Plaintiff was terminated from employment due to her sending the letter in question.[1]  Plaintiff has brought suit alleging both a First Amendment violation as well as a violation of one of Indiana's state whistleblower statutes, Indiana Code section 36-1-8-8.

These cross-motions for summary judgment are fully briefed and ripe for adjudication.

DISCUSSION

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S.

---

[1] Defendants stipulate that Plaintiff's letter was a substantial motivating factor in her termination.

317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue

-7-

may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

First Amendment Claim

When a government employee, such as Plaintiff, is terminated and alleges her exercise of protected speech motivated the termination, the familiar *Connick-Pickering* test must be analyzed. *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

The first element of the *Connick-Pickering* test requires the Court to determine whether the speech in question addresses a matter of public concern. *See Delgado v. Jones*, 282 F.3d 511, 516 (7th Cir. 2002). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147. If the speech involved addresses a matter of public concern, the Court must then address the second element – the *Pickering* balancing test - to determine whether "the interests of the

-8-

[plaintiff], as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999)(citation omitted). Both of these issues are questions of law. *Wainscott v. Henry* 315 F.3d 844, 848 (7th Cir. 2003); *Snider v. Belvidere Township*, 216 F.3d 616, 620 (7th Cir. 2000).

The threshold issue is whether Plaintiff's letter addressed a matter of public concern. It is Plaintiff's burden to demonstrate that her speech was on a matter of public concern. *McGreal v. Ostrov*, 368 F.3d 657, 672 (7th Cir. 2004). The content of Plaintiff's letter addresses two specific security lapses at the Warren County Jail and that other unidentified violations occur daily. The letter also alleges that, even though she continually reminded Sheriff Miller of the security breaches, he has nonetheless failed to enforce certain rules, which allows the security lapses to continue. Content is the most important consideration in determining whether a public employee's speech is on a matter of public concern. *Glass v. Dachel*, 2 F.3d 733 (7th Cir. 1993). Not all speech relating to prisons is a matter of public concern. *See e.g.*, *Button v. Kibby-Brown*, 146 F.3d 526 (1998)(finding that prison employee's complaints regarding his supervisor's refusal to return donated educational materials not a matter of public concern); *see also Connick*, 461 U.S. at 146 (noting that speech by a government employee relating to ordinary matters of

-9-

internal operation unrelated to "any matter of political, social, or other concern to the community" is not protected by the First Amendment); *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974-75 (7th 2000).  However, issues of prison security and public safety do, indeed, relate to public concern.  *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004).   Defendants make various collateral attacks on the allegations contained in the letter, *see* Defs.' Resp. to Pl.'s Mot. for Summ. J., pp. 8-12, including that the allegations are sensationalized and inaccurate.  Nevertheless, at this stage, the Seventh Circuit has taught that any truthfulness concerns are not relevant as to whether an issue is a matter of public concern. *McGreal*, 368 F.3d at  673.  The Court also notes that Defendants believe the letter is merely a personal attack on Sheriff Miller. However, taken in a light most favorable to Plaintiff, the Court finds Plaintiff's complaints are more akin to those surrounding prison security rather than prison internal office affairs.  Therefore, this Court remains convinced that, if true, the content of these allegations is of some public concern.  *Spiegla*, 317 F.3d at 936.

As to form, Plaintiff took her complaints to the Warren County Commissioners, the Indiana Department of Occupational Health, the Sheriff, the Warren County Attorney and Evelyn Turner of the Indiana Department of Corrections.  Plaintiff sent this letter to these people and entities because she "just felt like that's where you should send the letters, because they all needed to be aware of it.  The merit

board was in control of the deputies, and the county attorney, the Department of Corrections, because we hold DOC prisoners and some of the trustees was going back into the cells with the DOC prisoners. I just felt those was the county officials that needed to know that to get help or – I didn't know who else to go to." (Pl.'s Dep., p. 55)  Despite this subjective belief, the Warren County Commissioners do not have the authority to control the Sheriff's actions.  *See Carver v. Crawford*, 564 N.E.2d 330 (Ind. Ct. App. 1990).  Indeed, under Indiana law, a county sheriff is the final policymaker for law enforcement in his or her jurisdiction.  *Eversole v. Steele*, 59 F.3d 710 (7th Cir. 1995).  Consequently, none of those entities could have done anything to correct the perceived problem.  Plaintiff has failed to cite any law to the contrary.  Thus, the form of her speech - sending the letter to various governmental entities - is questionable at best.  Indeed, although Plaintiff maintains she is concerned for public safety, Plaintiff did not inform any of her co-workers or the public in general of her concerns. (Pl.'s Dep, p. 64.)  As such, the communication does not tend to "lend a public air to the form of these complaints."  *Cf. Breuer*, 909 F.2d at 1038 (complaining to state authorities who had the prosecutorial authority to investigate them lended a public air to the form of the complaints); *see also Wales v. Bd. of Educ. of Comm. Unit School Dist. 300*, 120 F.3d 82, 84 (7th Cir. 1997)(noting that to whom the statement was made is a clue to determine whether the speech is of public or private concern).

-11-

Contextually, it seems apparent that this matter stemmed from a personal employment grievance Plaintiff had with the Sheriff's Department. Based upon her own testimony, Plaintiff called the labor board in Lafayette, Indiana to inquire about employment related issues, including overtime pay, as to her employment with the Sheriff's Department. (Pl.'s Dep., pp. 42-48)  During her conversations with the labor board, she claims to have been told by a labor board employee that the "safety issues" in the jail should be her biggest concern. (Pl.'s Dep., pp. 42-43.)  Relying on the labor board's advice, she pursued complaining about the safety issues at the jail. Based on this predicate, it is apparent Plaintiff's speech was motivated by her personal crusade of self-interest. Nevertheless, this Circuit, like many others, has noted that the motive behind an employee's speech, while relevant, is not dispositive. *Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir. 1998).

Taking into account the content, context and form, this Court finds whether Plaintiff's letter equals a matter of public concern is close. Indeed, while the content of Plaintiff's letter touches upon a matter of public concern, its form and context do not. Upon due consideration, and placing the most weight on content, the Court finds Plaintiff's letter, if true, tips the scale and constitutes a matter of public concern.

The Court turns to the *Pickering* balancing test to determine if Plaintiff's interests, as a citizen, in commenting upon matters of

public concern are outweighed by the interests of Warren County, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering*, 391 U.S. at 568. Defendants have the burden to establish that the Sheriff's interest outweighs Plaintiff's freedom of speech.

The Seventh Circuit has outlined a number of factors to consider in conducting the *Pickering* balancing test:

> *Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [her] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed-decision making; and (7) whether the speaker should be regarded as a member of the general public.

*Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000).

This Circuit has acknowledged that, "with respect to the first two factors, a government employer is allowed to consider the 'potential disruptiveness' of the employee's speech." *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999)(quoting *Caruso v. DeLuca*, 81 F.3d 666, 670-71 (7th Cir. 1996). In addition, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151-52. "Deference

to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Kokkinis*, 185 F.3d at 845. "The public safety employer's determinations of both the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are entitled to 'considerable judicial deference.'" *Id.* at 845-46 (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1344 (8th Cir. 1993).

Sheriff Miller's reliance on the potential disruption of the Sheriff's Department as justification for terminating Plaintiff is sufficient to tip the *Pickering* balance in Defendants' favor.[2] The Seventh Circuit has previously acknowledged that the Warren County Sheriff runs a small police operation, wherein potential disruption is of consequence. *Breuer*, 909 F.2d at 1040. In this case, Sheriff Miller believed that Plaintiff's letter mischaracterized the department's operation and also found allegations in the letter to be misleading and false. As such, Sheriff Miller believed the letter tended to disrupt the close-knit operation of the Warren County Sheriff's Department. Sheriff Miller had concerns about Plaintiff's

---

[2]While it was not factored in, the Court notes that as Plaintiff's speech barely passed muster under the *Connick* prong, it would seem logical that Defendants' burden would be reduced under the *Pickering* prong. *Connick*, 461 U.S. at 150; *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1324 (11th Cir. 1989); *Zamboni v. Stamler*, 847 F.2d 73, 78 (3d Cir. 1988). Indeed, the *Connick* prong is all but intrinsically intertwined with the *Pickering* prong. Under this framework, Defendants task of satisfying the *Pickering* prong would have easily been surpassed.

ability to work effectively in the future with the small group of employees at the jail, as a result of Plaintiff's criticism of both the Department and employees she worked with.  It was also Sheriff Miller's position that Plaintiff's letter violated various policies and general orders of the Sheriff's Department.  (Compl. Ex. C.)

In addition, Sheriff Miller concluded that Plaintiff's letter constituted a challenge to his authority and was calculated to embarrass both him and the Sheriff's Department, as Plaintiff sent the letter to other governmental entities that have no authority over the operation of the Sheriff's Department or county jail.  It was not unreasonable for Sheriff Miller to believe Plaintiff's letter was an attempt to undermine his ability to maintain authority and discipline within the Sheriff's Department.  Indeed, the Plaintiff's letter essentially states that Sheriff Miller's failure to enforce policy was the reason for the security lapses.  Consequently, Sheriff Miller was entitled to take action to remedy the actual and potential disruption. Simply, Sheriff Miller's interest in running his department efficiently and in maintaining order and discipline among the ranks outweighs Plaintiff's limited interest in speaking out in the manner she did.

Notably, Plaintiff speculates only that Defendants' interest in preventing her speech is "low" because the speech "could lead to a more efficient and safe provision of public services."  (Pl.'s Br. in Supp., p. 9.)  Aside from this speculation, however, Plaintiff fails

-15-

to address any facts – including those contained in Sheriff Miller's affidavit – or law regarding the *Pickering* analysis.

Retaliatory Discharge Claim

Plaintiff's second claim against Defendants is brought pursuant to Indiana Code section 36-1-8-8, one of Indiana's whistleblower statutes, entitled "Protection of employees reporting violations of federal, state, or locals laws; disciplinary actions; procedures." Defendants claim there is no private right of action under this statute and, therefore, they are entitled to judgment as a matter of law.

Indiana law provides that if there is no definite term of employment, then the employment is at-will and is presumptively terminable at any time, with or without cause. *Coutee v. Lafayette Neighborhood Housing Servs., Inc.*, 792 N.E.2d 907, 911 (Ind. Ct. App. 2003).  However, Indiana recognizes certain exceptions to the employment-at-will doctrine.  One such exception, termed the public policy exception, exists if an employee is discharged for exercising a statutory or constitutional right, *Pepsi-Cola General Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 697 (Ind. Ct. App. 1982), or for refusing to commit an illegal act for which he would be personally liable. *McGarrity v. Berlin Metals, Inc.*, 774 N.E.2d 71, 76 (Ind. Ct. App. 2002).

The public policy exception is construed narrowly and has been

-16-

held to be inapplicable in cases where the Indiana General Assembly has provided a remedy for violation of a statutory right in the statute itself.  *Coutee*, 792 N.E.2d at 911; *Groce v. Eli Lilly & Company*, 193 F.2d 496, 503-504 (7th Cir. 1999).  In *Coutee*, the Indiana Court of Appeals examined whether an employee who reported a misuse of public resources pursuant to section 22-5-3-3 of the Indiana Code, another one of Indiana's whistleblower statutes, had a common law tort claim for retaliatory discharge under the public policy exception to the employment-at-will doctrine.  The statute provides that an employee of a private employer that is under public contract may not be terminated for having reported, among other things, a misuse of public resources.  Ind. Code § 22-5-3-3.  The statute further provides that an employee who is disciplined for such action is "entitled to process an appeal of the disciplinary action as a civil action in a court of general jurisdiction."  *Id*.  The *Coutee* court affirmed the dismissal of the plaintiff's claim of retaliatory discharge, holding that any cause of action the plaintiff may have is under the statute, not the common law.  792 N.E.2d at 911.

In *Groce*, the 7th Circuit examined whether an employee who filed a complaint pursuant to section 38.1 of the Indiana Occupational Safety and Health Act ("IOSHA") had a common law tort claim for retaliatory discharge.  193 F.3d at 502-504.  The statute states that an employee may not be terminated for filing a complaint or initiating a proceeding under IOSHA.  Ind. Code § 22-8-1.1-38.1.  The statute

-17-

further provides that an employee who is discharged for such action may file a complaint with the commissioner, who must conduct an investigation to determine whether section 38.1 has been violated. *Id*. The *Groce* court concluded that the statute provides for adequate relief to an employee wrongfully discharged for filing a complaint under IOSHA and, thus, the Indiana Supreme Court would likely determine that a violation of IOSHA does not provide an employee with a common law tort cause of action for retaliatory discharge under Indiana law. 193 F.3d at 504.

Plaintiff alleges Defendants terminated her for exercising her statutory rights under section 36-1-8-8 of the Indiana code. This statute, protects public employees from discipline for reporting violations of law and misuse of public funds. Similar to the statute at issue in *Coutee*, the public employee whistleblower statute provides a specific remedy for violations of the statute:

> . . . any employee disciplined under this subsection is entitled to process an appeal of the disciplinary action under the procedure set forth in any personnel policy or collective bargaining agreement adopted by the political subdivision.

Ind. Code § 36-1-8-8. Considering the substantial similarity of the whistleblower statutes at issue in *Coutee* and the case at bar, the Indiana Supreme Court would likely treat both statutes in a similar fashion in interpreting the public policy exception to the employment-at-will doctrine. As such, the holding in *Coutee* prevents the public employee whistleblower statute from giving rise to Plaintiff's

retaliatory discharge claim.[3]


CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is **DENIED**.  Defendants' Motion for Summary Judgment is **GRANTED**.  The Clerk is **ORDERED to DISMISS** this case **with prejudice**.


**DATED:  March 14, 2006**                    /s/RUDY LOZANO, Judge
                                              **United States District Court**

---

[3]This is especially true considering Plaintiff failed to present any evidence that she pursued the remedies provided by the statue.  *Groce*, 193 F.3d at 504.